# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 05 2020, 8:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Michael B. Troemel
Lafayette, Indiana

Jennifer Schrontz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

Z.C. (Minor Child),

and

A.C. (Mother) & R.M. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

February 5, 2020

Court of Appeals Case No. 19A-JT-1778

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No. 79D03-1901-JT-5

**Altice, Judge.**

## Case Summary

[1] In this consolidated appeal, A.C. (Mother) and R.M. (Father) (collectively, Parents) appeal from the involuntary termination of their parental rights to their son Z.C. (Child). Parents present independent arguments challenging the sufficiency of the evidence supporting the termination order.

[2] We affirm.

## Facts & Procedural History

[3] Child was born in July 2013. Mother was Child's custodial parent. Father has never established paternity, but a 2017 DNA test confirmed his paternity during the underlying CHINS proceedings.

[4] On August 10, 2017, the Indiana Department of Child Services (DCS) became involved with the family and took custody of Child on an emergency basis. The facts related to DCS taking Child into emergency custody were set out by the trial court as follows:

> [Mother] was stopped by law enforcement on August 10, 2017 for driving a stolen vehicle that was associated with a homicide in Iowa. [Child] and four (4) other adults were also in the vehicle. Two (2) of the adults were arrested on outstanding warrants from Iowa. Mother was arrested for auto theft, possession of spice (synthetic marijuana), and driving while suspended. Mother also had two (2) active writs for her arrest. Mother's bond was set for $20,000 while awaiting extradition to Iowa for questioning about the homicide. [Child] was interviewed and it was believed [Child] also witnessed the homicide. [Father] could not be located. Additionally, [Child]

was behind on immunizations. [Child] was placed in foster care as no appropriate relatives were located.

*Appellants' Appendix Vol. II* at 24. Child has remained out of Mother's (or Father's) home since his removal.

[5] On August 14, 2017, DCS filed a petition alleging that Child, then four years old, was a child in need of services (CHINS) and included in the petition's allegations were details of Father's extensive criminal history. Father, who lived in Chicago at the time and had not seen Child since May, appeared at the initial hearing and detention hearing held that same day. Mother appeared in the custody of the sheriff. The trial court ordered that Child remain in foster care and also ordered, among other things, genetic testing and supervised parenting time.

[6] At the fact-finding hearing on October 12, 2017, Mother appeared and admitted the allegations in the CHINS petition. Father did not appear, except by counsel, because he had become incarcerated in Illinois for armed robbery on August 25, 2017. As a result, the trial court took the matter under advisement and continued the fact-finding hearing to November 20, 2017. The trial court found Child to be a CHINS. In the CHINS order, the court noted, among other things, the dire circumstances leading to DCS involvement, Mother's lack of stable housing and employment after being released from incarceration, and Father's current incarceration and his lengthy criminal history.

[7] Pursuant to the dispositional order issued in January 2018, Parents were ordered to complete substance abuse assessments and follow all recommended treatment, complete parenting assessments and follow all recommendations, submit to random drug screens, and participate in supervised parenting time. Additionally, Mother was ordered to participate in home-based case management, and Father was ordered to establish paternity. Later, by October 2018, Mother was also ordered by the court to complete a mental health assessment and follow all treatment recommendations.

[8] Father was incarcerated for all but the first two weeks of the CHINS case and unable to participate in services or parenting time. Mother's compliance with the case plan, as will be set out in more detail below, was incomplete and sporadic. As a result, following a permanency hearing in October 2018, the trial court changed the permanency plan to concurrent plans of reunification and adoption. By the end of 2018, Mother was incarcerated again.

[9] Following a permanency hearing on January 23, 2019, at which Parents appeared while in custody, the plan was changed to adoption and the court ordered DCS to initiate termination proceedings. DCS filed a petition for involuntary termination of parent-child relationship (TPR petition) against Parents on January 29, 2019.

[10] Fact-finding hearings on the TPR petition were held on March 1 and 22, 2019. The trial court took the matter under advisement and then issued its order terminating Parents' parental rights on July 4, 2019. In its order, the trial court

made numerous findings of fact, none of which is challenged by Parents. We note the following findings related to Mother's participation with services:

> 10.     Home-based case management services were referred to assist Mother with housing, employment, transportation, access to resources, and connecting with other service providers to complete assessments. Mother started case management with Lifeline in October of 2017 but made limited to no progress. Mother missed seven (7) sessions. Mother was hard to contact and moved from place to place. Mother indicated that she had housing and employment, but neither were verified. Mother was not receptive to suggestions. Services with Lifeline terminated in January of 2018 as Mother's whereabouts were unknown.

> 11.     Mother was referred to a new provider for case management in August of 2018, but services were terminated in November of 2018 due to lack of attendance. During that time, Mother obtained employment but was unemployed again by November and waiting to start a new job. Mother also located housing but was in the process of losing the housing by November. The home-based case manager tried to help Mother schedule a mental health assessment, but Mother had not accomplished this when services ended….

> 12.     At the time of the termination hearing, Mother was employed and had been employed for all but about three (3) months of the CHINS case when she was not incarcerated. However, Mother failed to demonstrate an ability to maintain stable housing. Mother is currently renting one (1) room in a house with access to common areas.

> 13.     Mother refused to participate in mental health services until December of 2018. Mother indicated she did not complete the mental health assessment reporting she did not want to be on medication after five (5) years of being "normal." Mother further

reported she was afraid of the court and DCS learning the severity of her mental health. Mother has extensive mental health history and reported she was inpatient at LaRue Carter for two and one-half (2 ½) years from ages sixteen (16) to eighteen (18). Mother was also adamant about not taking medication.

14. Mother attended inpatient mental health treatment in December 2018 at Sycamore Springs for approximately five (5) days to address anxiety, anger, and homicidal thoughts as well as spice and ecstasy abuse. Mother reported her depression and anxiety increased after being arrested for helping her brother after he committed a murder and that she began hearing voices. Mother reported PTSD symptoms and homicidal ideations towards people who are aggressive.… Mother was diagnosed with Bipolar, severe spice use, and severe recurrent MDD use. Mother's discharge plan was to enter a partial hospitalization program with multiple prescribed medications. There is no evidence Mother completed any recommended treatment after leaving Sycamore Springs.

15. Mother failed to participate in individual therapy. Mother was not responsive to attempts to initiate services in October 2017 and failed to attend two (2) scheduled appointments. On December 11, 2017, Mother arrived late for an appointment and was unable to be seen. [She had already missed three previous appointments.] Mother failed to attend on December 13, 2017 and was placed on a six (6) month waitlist. Attempts to reinitiate services with Mother in July 2018 were unsuccessful. Mother missed an appointment on August 16, 2018 and never engaged in any further therapy services.

16. Mother failed to participate in a substance abuse assessment as ordered. Mother indicates that she completed a "substance reflection" during her inpatient hospitalization for mental health. Mother did not participate in substance use treatment …. Mother failed to submit to any drug screens until

July of 2018. Mother tested positive on three (3) screens in September of 2018 (opiates/hydrocodone/hydromorphone). Mother submitted to other drug screens until her incarceration in December 2018.

17. During the CHINS case, Mother was on house arrest, in work release, and incarcerated at various points. In November of 2017, Mother was convicted of Possession of a Synthetic Drug or Lookalike Substance (Class A Misdemeanor) from an arrest at the beginning of the CHINS case. A probation violation was filed on June 28, 2019 and a warrant was issued for Mother's arrest. Mother was arrested in July of 2018 on a warrant for failure to appear and driving while suspended. Mother was on house arrest in November of 2018 but had to return to work release due to a lack of housing. Mother had four (4) conduct violations from November 2018 until she was sent back to jail on December 28, 2018, shortly after she left Sycamore Springs. In January of 2019, a Petition to Execute Community Corrections Sentence in Custody was filed. Mother was held in custody without bond until February 8, 2019.

18. Mother failed to participate in a parenting assessment.

19. Mother never progressed beyond fully supervised visits. Mother was discharged from at least three (3) agencies for non-compliance, missed visits, and failure to make or maintain contact. Between October 2017 to January 2018, Mother attended only twelve (12) of nineteen (19) scheduled visits. Services were discontinued as Mother's whereabouts were unknown. Mother resumed visits in February 2018 but was terminated within approximately four (4) weeks after getting upset and refusing to work with the provider. Mother stopped attending parenting time with a third provider in May 2018. Mother did not contact DCS until mid-June 2018 at which time Mother's visits were ordered to be therapeutically supervised. Mother attended visits fairly consistently until November 2018

when she missed three (3) visits. Mother's last visit with [Child] was in mid-December of 2018 prior to Mother's hospitalization and incarceration. After release from incarceration in February 2019, Mother failed to contact DCS to resume any visits before the start of the termination hearing. Mother's cancellation of visits at the last minute caused emotional distress for [Child] who would have violent outbursts.

*Id*. at 25-27.

[11]     The trial court made the following unchallenged findings regarding Father:

20.     Father has not established paternity for [Child], but a DNA test has confirmed biological parentage. Father reports providing care for [Child] in Chicago for a month or two (2) at a time prior to the CHINS case when Mother would get overwhelmed….

21.     Father has an extensive criminal history since at least 2011. Father was convicted of Operating While Never Receiving License (2011), False Informing (2012), Strangulation and Domestic Battery (2013), Theft (2013), Criminal Recklessness with a Deadly Weapon (2014), Trespass (2014), Failure to Stop After Accident with Unattended Vehicle (2016), and Theft (2016). Father's criminal history includes multiple warrants for failing to appear and multiple probation violations. Father was previously ordered to serve time in the Indiana Department of Correction.

22.     Father was incarcerated approximately two (2) weeks after [Child] was removed from the care of the parents. Father was incarcerated in the Cook County Jail in Illinois on August 25, 2017. Father was convicted of Aggravated Armed Robbery and sentenced to ten (10) years incarceration. Father remained at the Cook County Jail until being transported to the Illinois

Department of Correction (IDOC) in December of 2018 where he remains. Father's expected release date is June 2021. Father believes, with good time credit for a program, he may be released or transferred to Work Release in approximately one (1) year. If so, Father plans to enter a halfway house for ninety (90) days during which time [Child] would not be allowed to reside with Father. Father will also be on parole for two (2) years after release from IDOC.

23.     No services were available for Father at the Cook County Jail. Upon transfer to IDOC, Father started a substance abuse program called Westcare in January 2019. Prior to incarceration, Father submitted to only one (1) drug screen which tested positive for marijuana. Father did not complete a substance abuse assessment or a parenting assessment. Father attended two (2) visits before his incarceration in August of 2017 at which time [Child] had just turned four (4) years old. Father has not visited [Child] since then and [Child] is now nearly six (6) years old.

24.     Father has exhibited a pattern of criminal activity, incarceration, failure to appear in court, and probation violations both before and after [Child's] birth. Father's charges for Strangulation and Domestic Battery were filed in December of 2012. Mother appears to be the victim of those offenses and may have been pregnant with [Child] at the time. Father's criminal behavior intensified after [Child's] birth. Father's most serious conviction (Aggravated Armed Robbery) occurred during the CHINS case.

25.     Father wants [Child] to be placed with relatives or remain in foster care until Father's release from incarceration. Background checks have excluded relatives as placement options. [Child] would have to wait for Father to complete a ten (10) year sentence and the [sic] wait additional time for Father to complete services and establish stability.

*Id*. at 27.

With regard to Child, the court made the following finding:

> 26.      At the onset of the CHINS case, [Child] would have outbursts during which he threw himself on the floor, kicking and hitting. [Child] frequently used foul language and was aggressive to other children. During the CHINS case, [Child] participated in play therapy during which he discussed seeing "bad people" with guns and acted out bad people burning him while showing the therapist scars on his leg. It is clear that [Child] experienced a lot of trauma and did not have many boundaries. During therapy, [Child] has worked on coping skills, increasing empathy, behavior issues, role playing, boundaries, and healthy self-expression. [Child] has continued to struggle with his behavior including hyperactivity, irritability, impulsiveness, lying, stealing, disobedience, stubbornness, aggressive behavior, lack of attention span, violent outbursts, and quick and drastic mood changes. Mother was resistant to recommendations for medication. [Child] completed a psychological assessment and attended Selah Academy, which is a structured academy that specialized in behavioral issues. [Child] has been making some progress in therapy with increasing empathy and improving some behaviors. [Child] is placed in a foster home that is willing to adopt and appears to be adjusting well.

> 27.      CASA Staff Advocate, Leigh Ann Fricke, supports termination of parental rights and adoption in the best interests of [Child] as neither parent can provide a safe, stable, and nurturing environment. Father's historical pattern of criminal activity and incarceration continues, and Mother has not participated in services to address her mental health. CASA believes Mother's refusal to complete a mental health assessment has hindered the CHINS case. CASA also believed the parents cannot address the high needs of [Child] who requires an environment with lots of routine. CASA notes [Child] is the worst case of chronic trauma

she has observed in a child. [Child] continues to make comments about someone being run over by a car and other things he has seen. CASA believes [Child] has experienced a huge trauma that has not yet been addressed.

28. [Child] needs permanency now in order to address his trauma experiences in a safe and supportive environment. [Child] cannot wait any longer for either parent to resolve their own issues. Delaying permanency will have continued negative consequences for [Child's] mental and emotional well-being.

*Id*. at 28.

[13] Based on its findings of fact, the trial court ultimately concluded:

1. There is a reasonable probability the conditions that resulted in removal of [Child] from the care of the parents or the reasons for continued placement outside the home will not be remedied. Mother and Father have failed to demonstrate the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that Father will refrain from criminal behavior or that Mother will address her mental health issues to care and provide adequately for [Child].

2. Continuation of the parent-child relationships poses a threat to the well-being of [Child] who needs stability in life. [Child] needs parents with whom he can form a permanent and lasting bond who will provide for his emotional, psychological, and physical well-being. [Child's] well-being would be threatened by keeping him in parent-child relationships with Mother and Father whose own choices and actions have made them unable to meet [Child's] needs.

3. DCS has a satisfactory plan of adoption for the care and treatment of [Child] following termination of parental rights….

4. For the foregoing, reasons, it is in the best interests of [Child] that the parental rights of [Mother] and [Father] be terminated.

*Id*. at 28-29. Parents now appeal from the termination order.

## Discussion & Decision

[14] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[15] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App.

2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[16] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2. Mother and Father present different sufficiency arguments on appeal. We will address each in turn.

**Father**

[17] Father argues that there is insufficient clear and convincing evidence that the conditions resulting in Child's removal will not be remedied. In this regard, Father contends that he was "an active caregiver before his conviction" and is "capable of providing for his son upon his release [from prison] in the near future." *Appellants' Brief* at 8. Further, he assets that he "was not the reason for the initial removal" of Child. *Id*.

[18] Father's challenge fails for several reasons. First, he ignores the fact that the trial court found that clear and convincing evidence also established that the continuation of the parent-child relationship posed a threat to Child's well-being. I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive and, thus, requires the trial court to find only one of the requirements of the subsection by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d at 209. "Standing alone, the finding that the parent-child relationship posed a threat to the well-being of [Child] satisfies the requirement listed in subsection (B)." *Id*. In other words, we need not reach Father's arguments related to I.C. § 31-35-2-4(b)(2)(B)(i).

[19] Moreover, there was sufficient evidence to support the trial court's conclusion that a reasonable probability existed that the conditions resulting in Child's removal or continued placement outside Father's home will not be remedied.

> In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of

the child. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.

*In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (some citations omitted).

[20] Father's argument improperly focuses on the reasons for Child's initial removal from Mother's home, but the more apt consideration with respect to Father is why Child has been placed in foster care rather than with Father. The primary reason is clear – Father's extensive criminal history. The trial court noted a pattern of criminal activity and incarceration that began before Child's birth, continued during Mother's pregnancy with Child, and intensified after Child's birth in July 2013. Father's history includes convictions for violent offenses, such as strangulation and domestic battery (2013), criminal recklessness with a deadly weapon (2014), and aggravated armed robbery (2018). The latter is his most serious conviction, for which he was arrested only two weeks after Child was placed in foster care (rather than his home) during the CHINS proceedings and sentenced to ten years. Since that time, Father has been incarcerated and unable to participate in services[1] or exercise parenting time with Child, who

---

[1] We recognize that Father started a drug treatment program about two months before the termination hearing with hopes of an early release. There are little to no details in the record regarding this program or Father's progress therein.

Father has not seen since August 2017. Father's expected release date from prison is not until June 2021, and even then, he will be in no position to care for Child, who by that time will have been in foster care for nearly four years.[2]

[21] The trial court's conclusion that there is no reasonable probability that Father will refrain from criminal behavior and be able to care and provide adequately for Child is supported by the evidence. Moreover, Father does not challenge the trial court's alternative conclusion that continuation of the parent-child relationship poses a threat to Child's well-being. Accordingly, we affirm the termination of the parent-child relationship between Father and Child.

## Mother

[22] Mother presents only a brief argument on appeal. That is, she contends that termination is not in Child's best interests because she is "capable of caring for her son" and bonded with him. *Appellants' Brief* at 8. She claims that the evidence shows that she is "making progress with her mental health, that she is employable, and capable of providing good housing." *Id.* at 15. We reject Mother's invitation to reweigh the evidence.

---

[2] Father is not on equal footing with the fathers in the cases he cites on appeal. *See e.g., Rowlett v. Vanderburgh Cty. Off. of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006) (termination reversed where father maintained a relationship with his children while incarcerated on drug charges, made a good faith effort to better himself as a person and a parent while in prison by taking college courses and over 1000 hours of individual and group services, and was scheduled to be released within six weeks of the termination hearing), *trans. denied.*

[23]     In making the best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013).  The court must subordinate the interest of the parent to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship.  *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).  Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child."  *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).  "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[24]     The evidence establishes that Mother has made little progress with services and was discharged by a number of providers.  She did not complete home-based management services, a parenting assessment, individual therapy, or a substance abuse assessment and only sporadically participated in supervised parenting time with Child.  Mother tested positive for opiates as recently as September 2018 and was reincarcerated December 2018 through February 2019.  She finally obtained a mental health assessment in December 2018 but did not complete the recommended treatment and did not contact DCS or

reestablish parenting time upon her subsequent release from jail. Further, Mother failed to demonstrate an ability to maintain stable housing.

[25] Based on Mother's lack of progress, significant concerns related to her untreated mental health, and Child's need for stability and permanency, the CASA opined that termination was in Child's best interests. The CASA explained that a stable consistent routine and environment was especially important for Child and noted the trauma he has experienced in the past:

> I would say, and I've worked with many, many, many different children, that this is the most chronic case of an, or a traumatized child. I don't know what has happened to this child prior to coming on to this case, um, but I believe we haven't even gotten to the surface of what this child's been through. He's going to need continual therapy to address his mental health needs.

*Transcript* at 66.

[26] Similarly, the current DCS family case manager testified that she believed continuation of the parent-child relationship would be harmful to Child because Mother had been unable to establish stability with regard to her mental health and her environment. She testified that it was in Child's best interests to be adopted into a home that can care for his needs.

[27] The evidence supports the trial court's finding that delaying permanency will have continued negative consequences for Child's mental and emotional well-being. Child needs and deserves permanency now, which Mother cannot

provide. Ample evidence establishes that termination of Mother's parental right is in Child's best interests.

[28] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.